*In The*

# United States Court of Appeals

*For The Ninth Circuit*

## CONSUMER FINANCIAL PROTECTION BUREAU,

*Petitioner – Appellee,*

**v.**

## FUTURE INCOME PAYMENTS, LLC,

*Respondent – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR CENTRAL CALIFORNIA, SANTA ANA DIVISION**

———————

**BRIEF OF APPELLANT**

———————

| | |
|---|---|
| Christopher W. Jones | Isabelle L. Ord |
| Samuel B. Hartzell | Julia Marie Brighton |
| WOMBLE BOND DICKINSON (US) LLP | DLA PIPER LLP (US) |
| 555 Fayetteville Street, Suite 1100 | 555 Mission Street, Suite 2400 |
| Raleigh, North Carolina 27601 | San Francisco, California 94105 |
| (919) 755-2100 | (415) 836-2500 |
| | |
| *Counsel for Appellant* | *Counsel for Appellant* |

## CORPORATE DISCLOSURE STATEMENT

Future Income Payments, LLC, has no parent corporation. No publicly held corporation owns 10% or more of its stock.

/s/ Christopher Wayne Jones
*Counsel for Appellant*
*Future Income Payments, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ..................................................... 5

STATEMENT OF THE ISSUES .......................................................... 5

CONSTITUTIONAL AND STATUTORY AUTHORITIES ..................... 6

STATEMENT OF THE CASE .............................................................. 6

    A.    Overview of the CFPB ......................................................... 6

    B.    A D.C. Circuit Panel and the United States Agree that the CFPB's Single-Director Structure Is Unconstitutional ................................................................. 9

    C.    The CFPB's Civil Investigative Demand to FIP ................. 14

    D.    Procedural History ............................................................ 15

SUMMARY OF ARGUMENT ............................................................. 17

STANDARD OF REVIEW .................................................................. 20

ARGUMENT ...................................................................................... 21

    A.    The CFPB's Unprecedented Structure Violates Article II Because the CFPB Is Headed by a Single Director Who Executes Federal Law Without Accountability to the President ....................................................................... 21

1. The President's Executive Responsibilities Under Article II Include the Power to Oversee and Control Those Who Execute the Laws ......................... 21

2. The Supreme Court Has Recognized Only Two Circumstances in Which Congress Can Restrict the President's Removal Power ................................... 23

   a. The *Humphrey's Executor* Exception .................. 24

   b. The *Morrison* Exception ...................................... 34

   c. The Supreme Court Has Restricted *Humphrey's Executor* and *Morrison* to Their Facts ................................................................. 36

3. The CFPB's Novel Structure Violates Article II Because the CFPB is Headed by a Single Director Who Executes Federal Law Without Accountability to the President ................................... 39

   a. The District Court Erred by Extending the Supreme Court's Holding in *Humphrey's Executor* to the CFPB's Novel Structure and Expansive Powers ............................................... 40

      i. The CFPB's Single-Director Structure Is an Unprecedented Departure from the Tradition of Creating Independent Agencies Headed by a "Body of Experts" ...................................................... 41

      ii. The CFPB's Executive Powers Far Exceed Those Held by the FTC in 1935 .... 47

   b. The Director is Not an Inferior Officer with Limited Tenure and Jurisdiction ........................ 53

      c.    The District Court Erred by Upholding the CFPB's Novel Structure ...................................... 54

   B.    The CFPB Cannot Enforce the CID Against FIP ................. 57

   C.    This Court Cannot Render the CID Enforceable by Modifying the CFPB's Structure .......................................... 59

CONCLUSION ......................................................................................... 64

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ....................................................... 60

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) ....................................................... 59

*Bowsher v. Synar,*
  478 U.S. 714 (1986) .............................................. *passim*

*Boyd v. United States,*
  116 U.S. 616 (1886) ....................................................... 64

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .......................................................... 59

*CFPB v. Accrediting Council for Indep. Colleges & Sch.,*
  854 F.3d 683 (D.C. Cir. 2017) ........................................ 20

*CFPB v. Gordon,*
  819 F.3d 1179 (9th Cir. 2016) .......................... 20, 51, 64

*CFPB v. Morgan Drexen, Inc.,*
  60 F. Supp. 3d 1082 (C.D. Cal. 2014) ............................ 16

*CFPB v. Navient Corp.,*
  No. 3:17-cv-00101-RDM,
  2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) .............. 48-49

*City of Arlington, Tex. v. FCC,*
  569 U.S. 290 (2013) ....................................................... 50

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ...................................................... 55

*Clinton v. Jones*,
    520 U.S. 681 (1997) ...................................................... 55

*Cook v. Tullis*,
    85 U.S. 332 (1873) ........................................................ 64

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ...................................................... 47

*Davidson v. City of New Orleans*,
    96 U.S. 97 (1877) ......................................................... 50

*Fed. Election Comm'n v. NRA Political Victory Fund*,
    513 U.S. 88 (1994) .................................................. 63-64

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    537 F.3d 667 (D.C. Cir. 2008) ............................... 38, 47

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ............................................. *passim*

*FTC v. Am. Nat. Cellular*,
    810 F.2d 1511 (9th Cir. 1987) ..................................... 33

*FTC v. Am. Nat. Cellular*,
    868 F.2d 315 (9th Cir. 1989) ....................................... 33

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948) ...................................................... 29

*FTC v. Colgate-Palmolive Co.*,
    380 U.S. 374 (1965) ...................................................... 32

*FTC v. H.N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982) ..................................... 33

*FTC v. Jantzen, Inc.*,
    356 F.2d 253 (9th Cir. 1966) .............................................. 30, 31, 49

*FTC v. R.F. Keppel & Bro.*,
    291 U.S. 304 (1934) ....................................................................... 31

*FTC v. Raladam Co.*,
    283 U.S. 643 (1931) ................................................................. 31, 50

*Heater v. FTC*,
    503 F.2d 321 (9th Cir. 1974) ...................................................... 33, 50

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ............................................................. *passim*

*In re Aiken Cnty.*,
    645 F.3d 428 (D.C. Cir. 2011)...................................................... 24

*INS v. Chadha*,
    462 U.S. 919 (1983) ....................................................................... 55

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880) ................................................................. 58-59

*Medellin v. Texas*,
    552 U.S. 491 (2008) ....................................................................... 47

*Metro. Washington Airports Auth. v. Citizens for*
*Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) ................................................................. 54-55

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................. *passim*

*Myers v. United States*,
    272 U.S. 52 (1926) ............................................................. *passim*

*Nat'l Petroleum Refiners Ass'n v. FTC,*
    482 F.2d 672 (D.C. Cir. 1973) ........................................ 50

*New York v. United States,*
    505 U.S. 144 (1992) ...................................................... 4

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) .................................................... 55

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014) ................................................ 44

*Oklahoma Press Pub. Co. v. Walling,*
    327 U.S. 186 (1946) .................................................... 57

*PHH Corp. v. CFPB,*
    839 F.3d 1 (D.C. Cir. 2016),
    *reh'g en banc granted* (Feb. 16, 2017) ................................... *passim*

*Plaut v. Spendthrift Farm, Inc.,*
    514 U.S. 211 (1995) .................................................... 57

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................... 19, 53

*Silver v. U.S. Postal Serv.,*
    951 F.2d 1033 (9th Cir. 1991) .................................... 22-23

*Standard Oil Co. (Indiana) v. United States,*
    283 U.S. 235 (1931) .................................................... 26

*Stern v. Marshall,*
    564 U.S. 462 (2011) .................................................... 64

*Synar v. United States,*
    626 F. Supp. 1374 (D.D.C. 1986) ................................... 22

*The Pocket Veto Case,*
   279 U.S. 655 (1929) ....................................................... 44

*U.S. ex rel. Kelly v. Boeing Co.,*
   9 F.3d 743 (9th Cir. 1993) ........................................... 28

*United States v. Golden Valley Elec. Ass'n,*
   689 F.3d 1108 (9th Cir. 2012) ..................................... 57

*United States v. Kuchinski,*
   469 F.3d 853 (9th Cir. 2006) ....................................... 20

*Watkins v. United States,*
   354 U.S. 178 (1957) ..................................................... 58

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV .................................................... 57

U.S. Const. art. II ................................................. *passim*

U.S. Const. art. II, § 1 ........................................... 21, 47

U.S. Const. art. II, § 3 ........................................ 4, 21, 59

## STATUTES

12 U.S.C. § 2601 *et seq.* ............................................... 7

12 U.S.C. § 5302 ........................................................... 60

12 U.S.C. § 5481(6)(A) .................................................. 7

12 U.S.C. § 5481(12) ..................................................... 7

12 U.S.C. § 5481(15)(A)(xi) ........................................... 6

12 U.S.C. § 5491(b)(1) ................................................... 8

12 U.S.C. § 5491(b)(2) ................................................... 8

12 U.S.C. § 5491(c)(1) ............................................... 9, 53

12 U.S.C. § 5491(c)(3) ................................................... 9

12 U.S.C. § 5497(a) ...................................................... 9

12 U.S.C. § 5497(a)(2)(C) .............................................. 9

12 U.S.C. § 5511(a) .................................................. 6, 51

12 U.S.C. § 5531(a) ...................................................... 7

12 U.S.C. §§ 5561–67 ................................................... 7

12 U.S.C. § 5562(c)(1) .................................................. 8

12 U.S.C. § 5562(e)(1) ............................................... 5, 8

12 U.S.C. § 5563(a) ...................................................... 8

12 U.S.C. § 5564(a) .................................................... 48

12 U.S.C. § 5564(f) ...................................................... 8

12 U.S.C. § 5565(a)(2) .................................................. 8

12 U.S.C. § 5565(a)(2)(H) ............................................ 51

12 U.S.C. § 5581(a)(2)(A) .............................................. 7

12 U.S.C. § 5581(b)(5)(B)(ii) ........................................ 61

15 U.S.C. § 41 .......................................................... 25

15 U.S.C. § 45 .......................................................... 49

15 U.S.C. § 53(a) .................................................................. 32

15 U.S.C. § 57b(b) ............................................................... 33

15 U.S.C. § 78d(a) ............................................................... 42

15 U.S.C. § 1601 *et seq.* ....................................................... 7

15 U.S.C. § 2053(c) ............................................................. 42

28 U.S.C. § 49 ..................................................................... 34

28 U.S.C. § 591 *et seq.* ...................................................... 34

28 U.S.C. § 1291 ................................................................... 5

42 U.S.C. § 1320a-8(b)(1) .................................................. 46

42 U.S.C. § 7171(b)(1) ......................................................... 42

**RULES**

9th Cir. R. 28-2.7 .................................................................. 6

Fed. R. App. P. 4(a)(1)(B)(ii) ................................................. 5

**OTHER AUTHORITIES**

1 Annals of Cong. 463 (1789) ......................................... 22, 56

156 Cong. Rec. H5239 (daily ed. June 30, 2010)
(statement of Rep. Maloney) .............................................. 62

Brief for the United States as Amicus Curiae,
*PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 17, 2017),
2017 WL 1035617 ....................................................... *passim*

Brief on Rehearing En Banc of CFPB,
*PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 31, 2017),
2017 WL 1196119 ................................................................. 48

*CFPB,* About Us: The Bureau,
https://www.consumerfinance.gov/about-us/the-bureau/
(last visited Nov. 21, 2017) .............................................. 18-19

Consumer Financial Protection Act of 2010,
Pub. L. 111-203, 124 Stat. 2018 (2010) .................................... 6

Daniel A. Crane, *Debunking* Humphrey's Executor,
83 Geo. Wash. L. Rev. 1835 (2015) ........................................ 30

Department of the Treasury,
Financial Regulatory Reform: a New Foundation:
Rebuilding Financial Supervision and Regulation (2009) ..................... 62

Elizabeth Warren, *Unsafe at Any Rate: If It's Good Enough for
Microwaves, It's Good Enough for Mortgages. Why We Need a
Financial Product Safety Commission*, Democracy, Summer 2007 ....... 62

Federal Trade Commission Act,
Pub. L. No. 63-203, 38 Stat. 717 (1914) ............................... 29, 30

H.R. 4173, 111th Cong. § 4103 (as passed by House, Dec. 11, 2009) ..... 62

J. Howard Beales III & Timothy J. Muris, *Striking the
Proper Balance: Redress Under Section 13(b) of the FTC Act*,
79 Antitrust L.J. 1 (2013) .................................................. 32

John F. Manning, *Separation of Powers As Ordinary
Interpretation*, 124 Harv. L. Rev. 1939 (2011) ........................... 56

Magnuson-Moss Warranty—Federal Trade Commission
Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975) ............ 33

Robert E. Cushman, *The Independent Regulatory Commissions* (Octagon Books 1972) (1941).................................................. 42

S. Comm. on Governmental Affairs, *Study on Federal Regulation,* S. Doc. No. 95-91, vol. 5 (1977)............................................. 43

S. Rep. No. 92-269 (1971) ........................................ 32, 33, 50

S. Rep. No. 93-151 (1973) ..................................................... 33

Stanford Lawyer, Spring 2015 ............................................... 36

The Federalist No. 47 (James Madison) (J. Cooke ed. 1961) ............... 50

The Federalist No. 70 (Alexander Hamilton) (J. Cooke ed. 1961) ......... 23

The Federalist No. 72 (Alexander Hamilton) (J. Cooke ed. 1961) ......... 56

Wheeler–Lea Act, Pub. L. No. 75-447, 52 Stat. 111 (1938) ................... 32

## INTRODUCTION

Future Income Payments, LLC ("FIP") appeals an order requiring it to comply with a broad Civil Investigative Demand (the "CID") issued by the Consumer Financial Protection Bureau (the "CFPB") in the course of a law enforcement investigation that the CFPB is pursuing without presidential supervision or control. That ongoing investigation is unconstitutional because the Framers vested the Executive power in the President, not in the unelected and unaccountable head of an independent agency. The district court's order compelling compliance with the CID deprives FIP and the nation as a whole of the "structural protections against abuse of power" that the Framers recognized are "critical to preserving liberty." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010) (quoting *Bowsher v. Synar*, 478 U.S. 714, 730 (1986)).

In 2010, Congress established the CFPB as a new independent agency with broad responsibility for enforcing nineteen different federal consumer financial laws. Congress entrusted this new law enforcement agency to a single Director who serves a five-year term and is removable by the President only for cause. That removal restriction

prevents the President from setting—or even influencing—policy or enforcement priorities for the CFPB. Instead, the Director of the CFPB is solely responsible for executing the federal consumer financial laws.

This unprecedented usurpation of Executive power is unconstitutional. Article II of the Constitution "confers on the President 'the general administrative control of those executing the laws.'" *Id.* at 492 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). "It is *his* responsibility"—not the CFPB Director's—"to take care that the laws be faithfully executed." *Id.* at 493. Yet, in erecting the CFPB's unprecedented structure, Congress has prevented the President from discharging that Executive responsibility for the federal consumer financial laws because the President cannot oversee the faithfulness of the Director who executes them. That obstruction to the President's performance of his duties violates the separation of powers.

The Supreme Court's analysis in *Free Enterprise Fund* mandates reversal of the district court's judgment. In *Free Enterprise Fund*, the Court reaffirmed the President's removal power under Article II and struck down a "novel structure" that infringed that power. *Id.* at 496. In doing so, the Supreme Court emphasized that the exceptions to the

President's removal power are narrow and will not be expanded to cover a "situation not yet encountered by the Court," particularly where that new structure lacks historical precedent. *Id.* at 483. The *Free Enterprise Fund* Court also held that, where an agency found to be unconstitutionally structured was investigating a business, that business was entitled to relief "sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Id.* at 513.

This appeal mirrors *Free Enterprise Fund*. The CFPB—an agency with a novel structure that infringes the President's Article II removal power—is demanding that FIP comply with its CID by turning over virtually every business and financial record FIP has ever generated. In accordance with *Free Enterprise Fund*, the district court should have ruled that only a constitutionally structured agency accountable to the Executive could enforce those investigatory powers against FIP.

The district court ruled instead that FIP must comply with the CID because (1) the allocation of responsibility for enforcing the laws "is properly reserved for the political branches and the democratic process,"

and (2) the CID should be enforced even if the CFPB is structurally unconstitutional. Excerpts of Record ("E.R.") 20. That reasoning cannot be reconciled with *Free Enterprise Fund* or the separation of powers doctrine. The Constitution makes clear that the allocation of power among the branches of our government—including the President's power and duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3—is not subject to revision or reallocation through the political process.

The Constitution "divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *New York v. United States*, 505 U.S. 144, 187 (1992). Congress surrendered to that temptation in the aftermath of the 2008 financial crisis and concentrated power over the federal consumer protection laws in one person: the Director. Rather than checking Congress's encroachment on the Article II power, the district court blessed the CFPB's novel structure and ordered FIP to comply with the CFPB's demands. This Court should follow the Supreme Court's lead in *Free Enterprise Fund* by reversing the district court's judgment.

# STATEMENT OF JURISDICTION

The district court had jurisdiction under 12 U.S.C. § 5562(e)(1) over the CFPB's Petition to Enforce Civil Investigative Demand. The district court issued a final order on May 17, 2017, granting the CFPB's Petition. E.R. 3–24. FIP timely filed its Notice of Appeal on May 18, 2017. E.R. 1–2; *see also* Fed. R. App. P. 4(a)(1)(B)(ii).

This Court has jurisdiction under 28 U.S.C. § 1291 because FIP appealed the district court's final decision enforcing the CID.

# STATEMENT OF THE ISSUES

1. Whether Congress violated the Constitution's separation of powers doctrine, and specifically Article II, by creating the CFPB as an independent agency headed by a single Director and then vesting policy-making and law enforcement authority in that Director while depriving the Executive of the ability to supervise the Director's actions.

2. Whether a structurally unconstitutional agency can enforce a civil investigative demand that it issued as a part of a law enforcement investigation.

3. Whether this Court can reform the CFPB's unconstitutional structure and, if so, whether the district court nonetheless erred by

enforcing a civil investigative demand the CFPB issued while unconstitutionally structured.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

Pursuant to Circuit Rule 28-2.7, an addendum containing pertinent constitutional provisions and statutes is appended to this brief.

## STATEMENT OF THE CASE

### A.    Overview of the CFPB

Congress established the CFPB in 2010 in response to the 2008 financial crisis. *See* Consumer Financial Protection Act of 2010, Pub. L. No. 111-203, § 1051 *et seq.*, 124 Stat. 2018 (2010). Congress made this new agency independent from the President, gave it a novel single-Director structure, and instructed it to "implement and, where applicable, enforce Federal consumer financial law." 12 U.S.C. § 5511(a). The CFPB has jurisdiction over a broad range of financial products and services, including deposit taking, credit cards, loan servicing, and "such other financial product or service as may be defined by the [CFPB]." *Id.* § 5481(15)(A)(xi).

Congress gave the CFPB rulemaking and enforcement authority over eighteen existing consumer financial laws, including the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.* *See* 12 U.S.C. § 5481(12). Prior to the invention of the CFPB, seven different agencies had administered those laws, including the Federal Trade Commission (FTC) and the Board of Governors of the Federal Reserve System. *See Id.* § 5581(a)(2)(A). In addition, Congress authorized the CFPB to define and prohibit various "unfair, deceptive, or abusive act[s] or practice[s]" committed "in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(a).

The CFPB's broad enforcement powers are defined in 12 U.S.C. §§ 5561–67. The CFPB can pursue legal and equitable relief against "any person that engages in offering or providing a consumer financial product or service." *Id.* § 5481(6)(A). Available relief includes "rescission or reformation of contracts," "refund of moneys or return of real property," "restitution," "disgorgement or compensation for unjust enrichment," "payment of damages or other monetary relief," "public

notification regarding the violation, including the costs of notification," "limits on the activities or functions of the person," and "civil money penalties." *Id.* § 5565(a)(2). The CFPB can pursue this relief by filing suit in "a United States district court," *id.* § 5564(f), or by conducting its own "adjudication proceedings" subject to deferential Administrative Procedure Act review, *id.* § 5563(a).

The CFPB's enforcement powers include the authority to issue a civil investigative demand to "any person" as long as the Director "has reason to believe" that the person "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to a violation." *Id.* § 5562(c)(1). The CFPB can demand that the recipient produce documents for inspection, file written reports or answers to questions, and give oral testimony. *See id.* If a person refuses to produce that information, the CFPB can compel compliance by filing a petition to enforce in federal district court. *See id.* § 5562(e)(1).

Congress vested all of the CFPB's enforcement and other powers in the agency's Director. *See id.* § 5491(b)(1). The Director is appointed by the President and confirmed by the Senate. *See id.* § 5491(b)(2).

Once confirmed, the Director serves a five-year term, *see id.* § 5491(c)(1), and is removable by the President only "for inefficiency, neglect of duty, or malfeasance in office," *id.* § 5491(c)(3). The Director also enjoys independence from Congress because he or she sets the CFPB's budget (in an amount up to twelve percent of the total operating expenses of the Federal Reserve System), and the Director can demand that sum from the Board of Governors. *See id.* § 5497(a). The Director's funding decisions are not reviewable by Congress (or the President). *See id.* § 5497(a)(2)(C).

As presently structured, the CFPB and its Director have the unilateral and unchecked power to determine enforcement priorities, to enact regulations with the force of law, to police compliance with those regulations, and to adjudicate enforcement actions and impose sanctions on those the Director decides have violated those regulations—all free from congressional or presidential supervision.

**B.    A D.C. Circuit Panel and the United States Agree that the CFPB's Single-Director Structure Is Unconstitutional**

In October 2016, the D.C. Circuit—the only appellate court to consider a separation-of-powers challenge to the CFPB's structure— held that "the CFPB is unconstitutionally structured because it is an

independent agency headed by a single Director." *PHH Corp. v. CFPB*, 839 F.3d 1, 36 (D.C. Cir. 2016), *reh'g en banc granted* (Feb. 16, 2017). The panel began its constitutional analysis with a ten-page description of "the background of independent agencies in general and the CFPB in particular," *id*. at 12, emphasizing the ways in which "the CFPB is the first of its kind and a historical anomaly," *id*. at 17. In particular, the CFPB is the only independent agency with "substantial executive authority" that has "ever been headed by *a single person*." *Id*. at 6.

As the panel explains, the Director's "enormous power over American business, American consumers, and the overall U.S. economy," *id*. at 7, makes him "the single most powerful official in the entire U.S. Government, other than the President," *id*. at 17. The Director "unilaterally enforces 19 federal consumer protection statutes, covering everything from home finance to student loans to credit cards to banking practices," and he or she "alone decides what rules to issue; how to enforce, when to enforce, and against whom to enforce the law; and what sanctions and penalties to impose on violators of the law." *Id*. at 7. Furthermore, many of the Director's decisions are discretionary and therefore made "in the twilight of judicially unreviewable

discretion." *Id*. at 35. Those unreviewable decisions include "when, how, and against whom to bring enforcement actions to enforce the law." *Id*.

The *PHH* Court also explains at length why the "CFPB's departure from historical practice matters" under controlling Supreme Court precedent. *Id*. at 21. In short, "Article II of the Constitution assigns the executive power to the President" to "preserve individual liberty and ensure accountability." *Id*. at 30. While "Article II has been interpreted by the Supreme Court to allow independent agencies in certain circumstances," *id*., those "agencies have traditionally been structured as multi-member bodies where the commissioners or board members can check one another," *id*. at 31. The CFPB, by contrast, "represents a sharp break from historical practice, lacks the critical internal check on arbitrary decisionmaking, and poses a far greater threat to individual liberty than does a multi-member independent agency." *Id*. Under "the Supreme Court's separation of powers precedents," that departure from historical practice "makes a significant difference for the individual liberty protected by the Constitution's separation of powers." *Id*. at 36. The panel therefore

held that "the CFPB is unconstitutionally structured because it is an independent agency headed by a single Director." *Id*.

In February 2017, the D.C. Circuit granted the CFPB's petition for rehearing en banc. The next month, the U.S. Department of Justice filed an amicus brief with the full D.C. Circuit in which the United States agrees that "the CFPB's for-cause removal provision . . . is unconstitutional." Brief for the United States as Amicus Curiae at 5 n.1, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 17, 2017), 2017 WL 1035617, at *5 n.1 ("Br. of United States"). Like the panel, the United States analyzes the Supreme Court's Article II jurisprudence and concludes that the Supreme Court has "recognized only one . . . restriction [on the President's general removal power] with respect to principal officers who head agencies." *Id*. at 8.

In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court "upheld a provision of the Federal Trade Commission Act establishing that FTC commissioners could be removed only for 'inefficiency, neglect of duty, or malfeasance in office.'" Br. of United States at 8 (quoting *Humphrey's Ex'r*, 295 U.S. at 620). In the Supreme Court's view, the FTC as it was structured in 1935 could not "in any

proper sense be characterized as an arm or an eye of the executive." *Id*. (quoting *Humphrey's Ex'r*, 295 U.S. at 628). That characterization of the FTC of 1935 was based on, among other things, the FTC's "structural features as an 'administrative body.'" *Id*. at 9 (quoting *Humphrey's Ex'r*, 295 U.S. at 628).

As the United States explains, the CFPB has a novel structure that "lacks [those] structural features" and therefore "is not covered by an essential aspect of the rationale underlying *Humphrey's Executor* and independent multi-member commissions." *Id*. at 12. In addition, "a single-headed independent agency creates concerns regarding the dispersion of executive power that are greater than those created by a multi-member independent commission." *Id*. at 14. The United States therefore concludes that the CFPB's independent structure presents "an unwarranted limitation on the President's executive power" that is unconstitutional and should be struck down. *Id*. at 19.

The en banc D.C. Circuit heard oral argument in *PHH* on May 24, 2017. As of the date of this filing, the D.C. Circuit has not announced its ruling.

**C.     The CFPB's Civil Investigative Demand to FIP**

In November 2016—after the D.C. Circuit had concluded that the CFPB is structurally unconstitutional, but before the en banc Court agreed to rehear that case—the CFPB served its CID on FIP.  E.R. 45–57.  FIP purchases income streams from individuals who expect to receive periodic payments from a pension or similar source and who wish to sell a portion of the income stream derived from those payments.  The CFPB reports that it has not made any determination of whether FIP's business practices comply with the laws and rules the CFPB enforces.  *Cf.* CFPB's Opp'n Mot. Stay at 1–2, Dkt. No. 8.

The stated purpose of the CID is to investigate whether "persons have engaged or are engaging in unlawful acts and practices in connection with offering or providing extensions of credit or financial advisory services," and whether a CFPB enforcement action "would be in the public interest."  E.R. 47.  The CID includes broad requests for FIP's private business and financial records, including information regarding FIP's "structure, investors, marketing, business relationships, bank accounts, collection efforts, [and] financial records." E.R. 5 (district court order); *see also* E.R. 48–51 (CID).

FIP asked the CFPB to withdraw the CID because, among other reasons, the D.C. Circuit had recently concluded that the CFPB is unconstitutionally structured. *See* E.R. 59. The Director denied that request because "government agencies may not entertain a constitutional challenge to authorizing statutes," E.R. 59, and the CFPB ordered FIP to comply with the CID, E.R. 63.

## D. Procedural History

In February 2017, the CFPB filed its Petition to Enforce the CID in the Central District of California. *See* E.R. 64–68. FIP once again opposed the CID on separation-of-powers grounds, s*ee* E.R. 25–44, but the district court rejected FIP's objections, *see* E.R. 3–24. The district court held that "the CFPB Director's for-cause protection from removal is constitutional, and, even if the agency were unconstitutionally structured, the enforcement of a subpoena issued by the agency would not be unconstitutional." E.R. 13.

The district court had previously denied another constitutional challenge to the CFPB's structure, and it reaffirmed its previous conclusion that the CFPB is constitutional under the Supreme Court's decision in *Humphrey's Executor* because the "CFPB executes

essentially the same responsibilities that the FTC did at the time of *Humphrey's Executor*." E.R. 15; *see also CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1087 (C.D. Cal. 2014) ("*Humphrey's Executor* is controlling in this case."). The district court rejected the *PHH* Court's reasoning to the contrary because, among other reasons, "the distinction *PHH* drew between multimember boards and directors is overly simplistic." E.R. 17. The trial court concluded that a "proper weighing of the advantages and drawbacks of each structure" is the only limitation on Congress's decision "whether to structure an independent agency as a multimember or director-led body" because the Constitution reserves that question for "the political branches and the democratic process." E.R. 20.

The district court also went a step further by holding in the alternative that the CID should be enforced against FIP "[e]ven if the CFPB Director's statutory protection from removal were unconstitutional under *PHH*'s reasoning." E.R. 20. The trial court concluded that an unconstitutional CFPB would retain its investigatory powers because "Congress unquestionably has the authority to issue

subpoenas" and it has given that same power to "every director-run independent agency." E.R. 21.

FIP noticed this appeal, E.R. 1–2, and moved for a stay pending appeal. After the district court rejected that motion, FIP sought an emergency stay in this Court. *See* FIP's Mot. Stay, Dkt. No. 6-1. This Court granted that motion by Order dated June 1, 2017 (Dkt. No. 10), and stayed enforcement of the CID pending this appeal.

## SUMMARY OF ARGUMENT

The Constitution "makes the President accountable to the people for executing the laws" and gives the President "the authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513–14 (2010). Yet the President cannot be responsible for the CFPB Director's execution of federal law—including the Director's decision to issue and enforce the CID to FIP—because Congress has given the Director a five-year term and forbidden the President from removing the Director based on policy disagreements or differing enforcement priorities. That limitation "contravenes the President's 'constitutional obligation to ensure the

faithful execution of the laws.'"  *Id.* at 484 (quoting *Morrison v. Olson*, 487 U.S. 654, 693 (1988)).

The Supreme Court has recognized only two exceptions to the President's general removal power: (1) an agency with limited Executive duties that is headed by a body of experts appointed by law and informed by experience, *see Humphrey's Ex'r v. United States*, 295 U.S. 602, 624 (1935); and (2) an inferior officer with narrow jurisdiction and limited tenure, *see Morrison*, 487 U.S. at 671–72.  The CFPB does not fit within either exception.  It is headed by a single Director who serves a term longer than the President's, is removable only for cause, and acts as the nation's primary enforcer of federal consumer financial law—a broad sector that covers large portions of the United States economy. This novel structure erodes the "structural protections against abuse of power" that the Framers recognized are "critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

The constitutional violation here is exemplified by the CFPB's description of itself as the "single point of *accountability* for *enforcing* federal consumer financial laws."  *See CFPB,* About Us: The Bureau, https://www.consumerfinance.gov/about-us/the-bureau/        (emphasis

added) (last visited Nov. 21, 2017) (reproduced at Addendum 51). That description is inconsistent with the Framers' decision to vest the law enforcement power in the President and their insistence "upon unity in the Federal Executive" in order to "ensure both vigor and accountability." *Printz v. United States*, 521 U.S. 898, 922 (1997). The CFPB arrogates that law enforcement power from the Executive and deprives the people of the accountability that the Constitution guarantees.

Congress cannot create an independent law enforcement agency headed by a single Director that is unchecked by the Executive. The district court erred by holding otherwise, and it further erred by ruling that a structurally unconstitutional law enforcement agency can lawfully force the people to turn over their private papers and information.

This Court should correct those errors by striking down the CID that the CFPB issued to FIP while unconstitutionally structured. The CFPB's constitutional defects are so deeply engrained—and so inextricably intertwined with legislative decisions by Congress detaching the CFPB from accountability to the Executive—that only

Congress can remedy those defects. While courts have the power to sever unconstitutional provisions, they cannot reform an unconstitutionally structured agency created by Congress into a constitutionally structured agency that Congress did not create or intend. Furthermore, any judicial amendment to the CFPB's structure that brings that agency into compliance with Article II would not allow the CFPB to retroactively ratify the CID that it issued while the CFPB's very nature violated the Constitution. The district court's judgment enforcing the CID should be reversed.

## STANDARD OF REVIEW

This Court reviews the district court's constitutional rulings de novo. *See CFPB v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016) ("This court reviews questions of constitutional law de novo."); *see also United States v. Kuchinski*, 469 F.3d 853, 857 (9th Cir. 2006) ("We . . . review claims that a rule or statute violates the separation of powers doctrine de novo."); *cf. CFPB v. Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017) ("A district court's decision on a petition to enforce an administrative subpoena is reviewed for abuse of

discretion, but the legal standard applied by the district court is reviewed *de novo*.").

## ARGUMENT

**A.** **The CFPB's Unprecedented Structure Violates Article II Because the CFPB Is Headed by a Single Director Who Executes Federal Law Without Accountability to the President**

1. The President's Executive Responsibilities Under Article II Include the Power to Oversee and Control Those Who Execute the Laws

Article II provides: "The executive Power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, and the President "shall take Care that the Laws be faithfully executed," *id.* § 3. The President discharges this responsibility to ensure faithful execution of the laws with the assistance of Executive officers because "the President alone and unaided could not execute the laws." *Myers v. United States*, 272 U.S. 52, 117 (1926). The President's "executive power" therefore includes the ability to "select those who [are] to act for him *under his direction* in the execution of the laws." *Id.* (emphasis added).

The President's power to choose and supervise those who execute the laws has been a fundamental part of our Constitution from the very

beginning. As James Madison stated on the floor of the First Congress, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789)). The Constitution "confers on the President 'the general administrative control of those executing the laws,'" *id.* (quoting *Myers*, 272 U.S. at 164), and it "is *his* responsibility to take care that the laws be faithfully executed," *id.* at 493.

To ensure that Executive officers follow the President's directions, the President must have the "exclusive power of removal." *Myers*, 272 U.S. at 122; *see also Bowsher*, 478 U.S. at 726 ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." (quoting *Synar v. United States*, 626 F. Supp. 1374, 1401 (D.D.C. 1986))). If the President "loses confidence in the intelligence, ability, judgment, or loyalty of any" Executive officer, he or she "must have the power to remove him without delay." *Myers*, 272 U.S. at 134; *see also Silver v. U.S. Postal*

*Serv.*, 951 F.2d 1033, 1039 (9th Cir. 1991) (per curiam) ("The power to remove is the power to control.").

The absence of that removal power "would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." *Myers*, 272 U.S. at 164. This impossibility, in turn, would prevent the President from being "held fully accountable for discharging his own responsibilities," and that "diffusion of authority 'would greatly diminish the intended and necessary responsibility of the chief magistrate himself.'" *Free Enter. Fund*, 561 U.S. at 514 (quoting The Federalist No. 70, at 478 (Alexander Hamilton) (J. Cooke ed. 1961)).

> 2. The Supreme Court Has Recognized Only Two Circumstances in Which Congress Can Restrict the President's Removal Power

The Supreme Court has recognized two circumstances in which Congress can lawfully restrict the President's removal power over Executive officers: (1) an independent agency with limited Executive duties that is headed by a "body of experts," *Humphrey's Ex'r*, 295 U.S. at 624; and (2) an inferior officer with narrow jurisdiction and limited tenure, *see Morrison*, 487 U.S. at 671–72.

a.     The *Humphrey's Executor* Exception

In *Humphrey's Executor*, the Supreme Court carved out the first exception to the President's removal power under Article II.  The Court held that "Congress can, *under certain circumstances*, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause."  *Free Enter. Fund*, 561 U.S. at 483 (emphasis added).  At least under current law,[1] those circumstances are present where the agency is (1) controlled by a multi-member body of experts, (2) non-partisan and politically independent, and (3) given only limited Executive powers.

The principal officer at issue in *Humphrey's Executor* was William E. Humphrey, one of five members of the FTC.  *See* 295 U.S. at 618–20.  President Herbert Hoover nominated Humphrey in 1931, and the

---

[1] While the CFPB is structurally unconstitutional under existing law, FIP would argue to the Supreme Court that *Humphrey's Executor* merits reexamination.  *Cf. Free Enter. Fund*, 561 U.S. at 483 ("The parties do not ask us to reexamine [*Humphrey's Executor* or its progeny], and we do not do so."); *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("[T]here can be little doubt that the *Free Enterprise* Court's wording and reasoning are in tension with *Humphrey's Executor* and are more in line with Chief Justice Taft's majority opinion in *Myers*.").

Senate confirmed him to a seven-year term expiring in 1938. *Id.* at 618. When President Franklin D. Roosevelt assumed office in 1933, he asked Humphrey to resign because "the aims and purposes of the Administration with respect to the work of the Commission can be carried out most effectively with personnel of [the President's] own selection." *Id.* Humphrey declined to resign, and President Roosevelt removed him from office. *Id.* at 619. Humphrey passed away five months later. *Id.* at 618.

The executor of Humphrey's estate sued the United States for Humphrey's salary during the five months between his removal and death. *Id.* The executor argued that Humphrey's removal was unlawful because the FTC Act provided that a commissioner of the FTC could be "removed by the President for inefficiency, neglect of duty, or malfeasance in office," none of which was cited by President Roosevelt as grounds for Humphrey's dismissal. 15 U.S.C. § 41. The Supreme Court agreed that Congress intended for this language to restrict the President's removal power, and it then analyzed whether the Constitution permitted Congress to impose that restriction. *See Humphrey's Ex'r*, 295 U.S. at 626–32.

The Court performed this analysis by discussing the structure and powers of the FTC as that agency was constituted in 1935. It explained that the FTC was "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628. These duties were "neither political nor executive," but instead "non-partisan" and to be carried out "with entire impartiality." *Id.* at 624. The FTC was "to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'" *Id.* (quoting *Standard Oil Co. (Indiana) v. United States*, 283 U.S. 235, 239 (1931)). This technocratic and independent body could not, the Supreme Court reasoned, "be characterized as an arm or an eye of the executive" because the FTC exercised all of its duties "in the discharge and effectuation of its quasi-legislative or quasi-judicial powers, or as an agency of the legislative or judicial departments of the government." *Id.* at 628.

The Supreme Court held in *Humphrey's Executor* that Congress could restrict the President's power to remove "officers of the character of those just named." *Id.* at 629. Specifically, the Court held that

Congress could impose good-cause removal restrictions where the affected agency is multi-member, non-partisan, and given only "quasi-legislative or quasi-judicial powers." *Id*. at 628.

The Supreme Court has since retreated from the *Humphrey's Executor* Court's description of the FTC's powers as quasi-legislative or quasi-judicial, and it has instead characterized those powers as Executive "at least to some degree." *Morrison*, 487 U.S. at 689 n.28 (citing *Bowsher v. Synar*, 478 U.S. 714, 761 n.3 (1986) (White, J., dissenting)).

In *Bowsher*, Justice White wrote in dissent that, contrary to the *Humphrey's Executor* Court's characterization, "the FTC's power to enforce and give content to the Federal Trade Commission Act's proscription of 'unfair' acts and practices and methods of competition is in fact 'executive'" because "it involves the implementation (or the interpretation and application) of an Act of Congress." *Bowsher*, 478 U.S. at 761 n.3 (White, J., dissenting). Two years later, the Supreme Court agreed in *Morrison* that "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time

be considered 'executive,' at least to some degree." 487 U.S. at 689 n.28 (quoting *Bowsher*, 478 U.S. at 761 n.3 (White, J., dissenting)).

Perhaps because of this "difficulty of defining such categories of 'executive' or 'quasi-legislative' officials," the *Morrison* Court disavowed those categorizations as a litmus test for Article II challenges. *Id.* The Court announced its "present considered view" that "the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" *Id.* at 689. Rather, the Court's analysis turns on whether Congress has "interfere[d] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id.* at 689–90; *see also U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 755 (9th Cir. 1993) ("The essence of the Court's removal analysis in *Morrison*, based on its interpretation of prior removal jurisprudence, is an inquiry into whether Congress has impermissibly encroached on executive power by limiting presidential removal authority.").

When read together, *Humphrey's Executor* and *Morrison* stand for the proposition that the FTC of 1935 did not wield Executive power to such an extent that the for-cause removal provision interfered with the President's power and duty to faithfully execute the laws. In the years since *Humphrey's Executor*, the Supreme Court has rejected efforts to encroach any further on the President's ability to supervise those executing federal law. The line drawn in *Humphrey's Executor* therefore represents the outer limit of Executive power that Congress can delegate to an independent agency.

When the Supreme Court decided *Humphrey's Executor*, the FTC was an antitrust regulator empowered to "prevent" businesses from "using unfair methods of competition in commerce." Federal Trade Commission Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914). The FTC could issue cease and desist orders directing a person, partnership, or corporation to stop competing unfairly in the future, but it could not punish past acts of unfair competition. *See, e.g.*, *FTC v. Cement Inst.*, 333 U.S. 683, 706 (1948) (explaining that the "effect of the Commission's order is not to punish or to fasten liability on respondents for past conduct but to ban specific practices for the future in

accordance with the general mandate of Congress"). Nor could the FTC sue in federal court. *See* Daniel A. Crane, *Debunking* Humphrey's Executor, 83 Geo. Wash. L. Rev. 1835, 1864 (2015) ("Under its original statutory mandate, which was still in place at the time of *Humphrey's Executor*, the FTC had no power to sue in federal district court."). Rather, Congress gave the Attorney General—not the FTC—the power to seek mandamus relief in federal court to enforce compliance with the FTC Act. *See* Federal Trade Commission Act § 9, 38 Stat. at 722.

The *Humphrey's Executor* Court's description of the FTC as quasi-legislative and quasi-judicial reflects the fact that the FTC was at that time empowered to define unfair methods of competition—a quasi-legislative act—and determine what acts fell within that prohibition—a quasi-judicial act. Once the FTC decided that a particular method of competition was unfair, it had to issue a complaint, hold a hearing, find a violation, and then issue a cease and desist order. *See, e.g.*, *FTC v. Jantzen, Inc.*, 356 F.2d 253, 254 (9th Cir. 1966), *rev'd on other grounds,* 386 U.S. 228 (1967). No penalty attached to violating that cease and desist order. *See id.* at 255. If the company continued to engage in the prohibited act after the entry of that order, the FTC had to show a

second violation, usually after a second hearing, and then seek enforcement in the court of appeals. *See id.* "No penalty attached to this second violation, other than the entry by the court of a decree enforcing the order." *Id.* Rather, the "decree had the force of an injunction" and further violations were punishable as contempt. *Id.* The FTC's reliance on this "very clumsy and time consuming procedure" distinguished the FTC from a law enforcement agency with broader Executive powers. *Id.*

Furthermore, the FTC's jurisdiction in 1935 was limited to the regulation of competition. For example, the Supreme Court held in 1931 that the FTC lacked jurisdiction to enjoin false and misleading weight-loss advertising because the "unfair methods" sought to be prohibited "must be such as injuriously affect or tend thus to affect the business of [actual or potential] competitors." *FTC v. Raladam Co.*, 283 U.S. 643, 649 (1931); *accord FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 313 (1934) (noting that the FTC had no power to "censor[] the morals of business men").

Congress amended the FTC Act in 1938 "to extend the Commission's jurisdiction to include 'unfair or deceptive acts or

practices in commerce'—a significant amendment showing Congress' concern for consumers as well as for competitors." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 384 (1965) (footnote omitted); *see also* Wheeler–Lea Act, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111 (1938). Congress also gave the FTC the power to "bring suit in a district court of the United States" to obtain a temporary injunction or restraining order against false advertising. Wheeler–Lea Act § 4, 52 Stat. at 115 (codified at 15 U.S.C. § 53(a)). Even after this amendment, however, "the sole enforcement weapon available to the FTC to police the vast majority of consumer frauds and cheats [was] the cease-and-desist order." J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act*, 79 Antitrust L.J. 1, 9 (2013) (quoting S. Rep. No. 92–269, at 3–4 (1971)).

In 1973, Congress further expanded the FTC's powers by authorizing it to seek preliminary and permanent injunctions for other unfair or deceptive acts. As the legislative history explained, Congress permitted the FTC "to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer."

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110–11 (9th Cir. 1982) (quoting S. Rep. No. 93-151, at 30–31 (1973)).[2]

The FTC first gained the power to seek monetary relief in 1975. *See* Magnuson-Moss Warranty–Federal Trade Commission Improvement Act, Pub. L. No. 93–637, § 206, 88 Stat. 2183, 2201–02 (1975). Prior to that year, the FTC's "cease and desist orders [had] prospective application only and afford[ed] no specific consumer redress to consumers already injured." *Heater v. FTC*, 503 F.2d 321, 326 (9th Cir. 1974) (quoting S. Rep. No. 92-269, at 24 (1971)). Beginning in 1975, the FTC could sue in federal court to obtain "rescission or reformation of contracts, the refund of money or return of property, [and] the payment of damages." 15 U.S.C. § 57b(b).

This gradual expansion of the FTC's powers since 1935 illustrates how limited those powers were when the Supreme Court decided *Humphrey's Executor*. The FTC had narrow jurisdiction over unfair methods of competition and no power to sue in federal court, to seek or

---

[2] This Court subsequently upheld the FTC's new "power to seek injunctive relief" because that power "does not so materially differ from the power to seek cease and desist orders as to render *Humphrey's Executor* inapposite." *FTC v. Am. Nat. Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987); *accord FTC v. Am. Nat. Cellular*, 868 F.2d 315, 318 (9th Cir. 1989).

impose monetary penalties, or to enjoin ongoing violations of its mandate. While those limited powers were Executive at least to some degree because they "involve[d] the implementation (or the interpretation and application) of an Act of Congress," *Bowsher*, 478 U.S. at 761 n.3 (White, J., dissenting), they were "predominantly quasi-judicial and quasi-legislative" because the FTC's primary role was defining unfair methods of competition, not enforcing federal law against the public, *Humphrey's Ex'r*, 295 U.S. at 624. As FIP explains below (on pages 40–56), the district court's application of that holding to the CFPB's broad law enforcement powers stretches *Humphrey's Executor* past the breaking point.

b.    The *Morrison* Exception

The other exception to the President's removal power does not apply to a principal officer such as the Director who controls an agency. Instead, it applies only to removal restrictions for an inferior officer with limited tenure and jurisdiction.

In *Morrison*, the Supreme Court rejected an Article II challenge to the independent counsel provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591 *et seq.* That Act allowed for the

"appointment of an 'independent counsel' to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws" and limited the President's ability to remove that counsel without cause. *Morrison*, 487 U.S. at 660.

The *Morrison* Court held that this removal restriction was constitutional because "the independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Id*. at 691. The Court analyzed the "functions" of the independent counsel and determined that the removal restrictions did not "impede the President's ability to perform his constitutional duty." *Id*. While the independent counsel performed some Executive functions and exercised discretion when deciding how to perform those functions, the Court did "not see how the President's need to control the exercise of that discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id*. at 691–92.

c.    The Supreme Court Has Restricted *Humphrey's Executor* and *Morrison* to Their Facts

There has been much criticism of the *Humphrey's Executor* and *Morrison* decisions as both outdated and inappropriate incursions on the President's removal powers under Article II.  The Court's holding in *Humphrey's Executor* was "considered by many at the time the product of an activist, anti-New Deal Court bent on reducing the power of President Franklin Roosevelt."  *Morrison*, 487 U.S. at 724 (Scalia, J., dissenting).  And, as the *PHH* Court explained, "the independent counsel experiment ended with nearly universal consensus that the experiment had been a mistake and that Justice Scalia had been right back in 1988 to view the independent counsel system as an unconstitutional departure from historical practice and a serious threat to individual liberty."  *PHH Corp.*, 839 F.3d at 20.  Indeed, Justice Kagan said that Justice Scalia's dissent in *Morrison* is "one of the greatest dissents ever written and every year it gets better."  *Id.* (quoting Stanford Lawyer, Spring 2015, at 4).

While the Supreme Court has not overruled *Humphrey's Executor* or *Morrison*, it has declined to extend those holdings beyond their limited facts and has signaled that those cases may no longer be viable.

In *Free Enterprise Fund*, the Court considered whether the two removal restrictions approved in *Humphrey's Executor* and *Morrison* could be combined. At issue was the constitutionality under Article II of the newly created Public Company Accounting Oversight Board, which regulates portions of the accounting industry. *See Free Enter. Fund*, 561 U.S. at 484. Like in *Morrison*, the inferior officers who served on that Board could be removed for cause by principal officers, the members of the Securities and Exchange Commission. *See id*. at 495. But those Commissioners, in turn, were removable by the President only for cause, a structure that was similar to the removal restrictions at issue in *Humphrey's Executor*. *See id.*

The Supreme Court began its analysis in *Free Enterprise Fund* by noting that the parties had not asked the Court to "reexamine" *Humphrey's Executor* or *Morrison*. *Id*. at 483. The Court then held that Congress could not "combine[]" the "separate layers of protection," *id.*, upheld in those cases because that "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President," *id*. at 484. In coming to this conclusion, the Court emphasized that the Public Company Accounting Oversight Board had

a "novel structure," *id*. at 496*,* that the Court had "not yet encountered," *id*. at 483. Foreshadowing the creation of the CFPB, the Court explained that this lack of "historical precedent" for the Board presented "[p]erhaps the most telling indication of the severe constitutional problem." *Id*. at 505 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

Even though the Board's multilayered structure merely combined features previously approved by the Court—removal restrictions for both multi-member commissions and for inferior officers—the Court held that this combination created a "new type of restriction" that violated Article II. *Id*. at 514. The Court also held that the plaintiffs who challenged that restriction were entitled to "relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Id*. at 513.

In total, the line of cases beginning with the "landmark case of *Myers*," *id*. at 492, and ending with *Free Enterprise Fund* establishes that the "Constitution that makes the President accountable to the

people for executing the laws also gives him the power to do so," *id.* at 513.  While the Supreme Court has "sustained in certain cases limits on the President's removal power," the Court has also made clear that new limitations on that removal power will not be tolerated—particularly where those new limitations lack historical precedent, as is the case with the unprecedented structure of the CFPB.  *Id.* at 514.

3.   The CFPB's Novel Structure Violates Article II Because the CFPB is Headed by a Single Director Who Executes Federal Law Without Accountability to the President

The CFPB vests Executive power in the hands of a Director who is not supervised by or otherwise accountable to the President.  This novel structure violates Article II of the Constitution because the President's inability to remove the Director except "for cause" prevents the President from supervising the Director or otherwise holding the CFPB accountable for its exercises of Executive power.  The CFPB's structure also does not fit within either of the two recognized exceptions to "the traditional default rule" that "removal is incident to the power of appointment."  *Free Enter. Fund*, 561 U.S. at 509.

The CFPB is not headed by "a body of experts" who wield only limited Executive powers.  *Humphrey's Ex'r*, 295 U.S. at 624.  Nor is the

Director an inferior officer with narrow jurisdiction. *See Morrison*, 487 U.S. at 672. The CFPB has massive and far-reaching powers historically reserved for the Executive branch, and it is structured as an agency headed by a single officer, which the United States describes in its brief to the D.C. Circuit as a "quintessentially executive structure." Br. of United States, 2017 WL 1035617, at *13. Accordingly, the President must retain the power to remove the Director in order to fulfill his "constitutional obligation to ensure the faithful execution of the laws." *Free Enter. Fund*, 561 U.S. at 484 (quoting *Morrison*, 487 U.S. at 693).

> a. The District Court Erred by Extending the Supreme Court's Holding in *Humphrey's Executor* to the CFPB's Novel Structure and Expansive Powers

The "principles animating the exception in *Humphrey's Executor* do not apply when Congress carves off a portion of [the President's] quintessentially executive power and vests it in a single principal officer below the President who is not subject to the President's control." Br. of United States, 2017 WL 1035617, *13. Unlike the FTC in 1935, the CFPB today has a prototypically Executive structure and wields broad Executive powers against the public. Neither the CFPB's structure nor

its exercise of Executive powers within that structure is permissible under *Humphrey's Executor*. The Supreme Court's holding in *Free Enterprise Fund* makes clear that the CFPB's combination of a single-Director structure and broad Executive powers in a single agency creates a "new type of restriction" on "the President's removal power" that is irreconcilable with Article II. *Free Enter. Fund,* 561 U.S. at 514.

    i.    The CFPB's Single-Director Structure Is an Unprecedented Departure from the Tradition of Creating Independent Agencies Headed by a "Body of Experts"

Until recently, each of the agencies to which Congress gave Executive powers has either been controlled by the President or headed by a multi-member deliberative body. Congress created the Interstate Commerce Commission as a multi-member body in 1887, and in the years since created twenty-four other independent agencies as multi-member commissions or boards, including the FTC. *See PHH Corp.*, 839 F.3d at 17–18 (listing independent agencies).

This tradition of creating multi-member independent agencies is "not merely accidental or coincidental." *Id.* at 28. For example, during the creation of the FTC, the structure and independence of that agency "were inextricably bound together" such that no proposal was made to

create a "commission . . . unless it be independent" or "an independent officer . . . rather than a commission." *Id.* (quoting Robert E. Cushman, *The Independent Regulatory Commissions* 188 (Octagon Books 1972) (1941)). This focus on independent commissions reflects the belief that multi-member agencies with staggered-term memberships would "facilitate deliberative group decision-making" and "promote long-term continuity and expertise." Br. of United States, 2017 WL 1035617, at *11.[3]

The necessity of group decision-making is particularly important because "multi-member independent agencies help prevent arbitrary decisionmaking and abuses of power." *PHH Corp.*, 839 F.3d at 26. "[W]hereas a multi-headed commission generally must engage in at least some degree of deliberation and collaboration, which tend toward

---

[3] In addition, Congress can mandate political diversity within multi-member boards, but it cannot do the same where a single director heads an agency. In *Humphrey's Executor*, the Supreme Court noted that Congress had made the FTC "non-partisan" and required that it "act with entire impartiality." 295 U.S. at 624. Since then, Congress has likewise mandated that the Securities and Exchange Commission, Consumer Product Safety Commission, and Federal Energy Regulatory Commission all include members of both major political parties. *See* 15 U.S.C. §§ 78d(a), 2053(c); 42 U.S.C. § 7171(b)(1). The CFPB, by contrast, is "open to the suspicion of partisan direction" because only one person (and therefore only one party) can control the CFPB at a time. *Humphrey's Ex'r*, 295 U.S. at 625.

compromise, a single Director can decisively implement his own views and exercise discretion without these structural constraints."  Br. of United States, 2017 WL 1035617, at *15.  Indeed, "an extensive study of independent agencies conducted in 1977 by the Senate Committee on Governmental Affairs," *id.* at *10, concluded that "'the relative importance to be attached to group decision-making'" was the "'[c]hief' consideration in determining whether to create an independent commission," *id.* at *11 (alteration in original) (quoting S. Comm. on Governmental Affairs, *Study on Federal Regulation,* S. Doc. No. 95-91, vol. 5, at 79 (1977)).  Justice Breyer echoed this same sentiment in *Free Enterprise Fund* when writing that "[a]gency independence is a function of several different factors," including the agency's "composition as a multimember bipartisan board."  561 U.S. at 547 (Breyer, J., dissenting).

At bottom, there is a "settled historical practice requiring multi-member bodies at the helm of independent agencies."  *PHH Corp.*, 839 F.3d at 25.  That practice is important here because a "'[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship

between Congress and the President." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). Moreover, multi-member commissions are the only independent regulatory agencies the Supreme Court has ever approved. In *Humphrey's Executor*, the Supreme Court upheld the FTC after noting that, "[l]ike the Interstate Commerce Commission, [the FTC's] members are called upon to exercise the trained judgment of a body of experts." 295 U.S. at 624.

Other than the CFPB, "independent agencies exercising substantial executive authority have all been multi-member commissions or boards." *PHH Corp.*, 839 F.3d at 17 (listing agencies). While Congress has created three other independent agencies with a single head, *see id.* at 18–20; Br. of United States, 2017 WL 1035617, at *17–19, none wields the broad and unchecked Executive authority that Congress delegated to the CFPB. Furthermore, each of those three agencies was recently created, and neither the Supreme Court nor this Court has approved their structures.

First, Congress established the Office of Special Counsel in 1978 as the first single-headed independent agency. *See PHH Corp.*, 839

F.3d at 19.  The Office of Special Counsel "is primarily responsible for enforcing personnel laws against government agencies and government employees."  *Id.* at 20.  For example, it can "seek corrective action through the Merit Systems Protection Board for violations of federal civil service personnel principles."  Br. of United States, 2017 WL 1035617, at *17.  In contrast to the CFPB, the Office of Special Counsel cannot "enforce laws against private citizens" or "impose fines and penalties on private citizens."  *PHH Corp.*, 839 F.3d at 20.

Second, in 1994, "Congress made the Social Security Administration a separate agency headed by a single Commissioner."  Br. of United States, 2017 WL 1035617, at *18.[4]  The Social Security Administration is the agency that the CFPB "primarily relied on" in the D.C. Circuit as precedent for the CFPB's single-Director structure.  *PHH Corp.*, 839 F.3d at 18.  Like the Office of Special Counsel and unlike the CFPB, the Social Security Administration "does not possess unilateral authority to bring law enforcement actions against private citizens."  *Id.* at 19.  Rather, the Social Security Administration

---

[4] Prior to 1994, the Social Security Administration had "long existed first as a multi-member independent agency and then as a single-Director executive agency within various executive departments."  *PHH Corp.*, 839 F.3d at 18.

"overwhelmingly engages in 'supervision of the adjudication of private claims for benefits.'"  Br. of United States, 2017 WL 1035617, at *18 (quoting *PHH Corp.*, 839 F.3d at 19).  While the Social Security Administration can seek to impose civil monetary penalties on those who make false statements in connection with private claims, the Administration can initiate such proceedings "only as authorized by the Attorney General."  42 U.S.C. § 1320a-8(b)(1).  The Attorney General— and by extension the President—retains ultimate control over this limited law enforcement function.

Third, Congress created the Federal Housing Finance Agency in the midst of the 2008 financial crisis as a new independent agency headed by a single Director.  *See PHH Corp.*, 839 F.3d at 20.  The Federal Housing Finance Agency is a "safety and soundness regulator for specified government-sponsored enterprises, namely Fannie Mae and Freddie Mac . . . as well as federal home loan banks."  Br. of United States, 2017 WL 1035617, at *18.  As with the other two independent agencies headed by a single individual, the Federal Housing Finance Agency cannot bring law enforcement actions against members of the public.

The limited powers of these three agencies confirm that the "CFPB is exceptional in our constitutional structure and unprecedented in our constitutional history." *PHH Corp.*, 839 F.3d at 21. Congress has never before given substantial Executive authority to one person not accountable to the President. This "lack of historical precedent" for the CFPB is the "most telling indication of the severe constitutional problem." *Free Enter. Fund*, 561 U.S. at 505 (quoting *Free Enter. Fund*, 537 F.3d at 699 (Kavanaugh, J., dissenting)); *accord Medellin v. Texas*, 552 U.S. 491, 531 (2008) (noting that consistent historical practice "can be treated as a 'gloss on Executive Power vested in the President by § 1 of Art. II'" (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981))).

> ii.    The CFPB's Executive Powers Far Exceed Those Held by the FTC in 1935

Even if the CFPB's single-Director structure were constitutionally permissible, the CFPB would still fall outside the bounds of the exception recognized in *Humphrey's Executor* because the CFPB's powers far exceed those held by the FTC in 1935. As discussed above, the FTC's law enforcement powers were so limited in 1935 that the Supreme Court held that "any executive function" the FTC performed

was ancillary to "its quasi-legislative or quasi-judicial powers." *Humphrey's Ex'r*, 295 U.S. at 628. The same cannot be said today of the CFPB—the federal government's self-described "primary enforcer of consumer financial laws." Brief on Rehearing En Banc of CFPB at 1, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Mar. 31, 2017), 2017 WL 1196119, *1.

Unlike the FTC in 1935, the CFPB can "commence a civil action against [any] person to impose a civil penalty or to seek all appropriate legal and equitable relief." 12 U.S.C. § 5564(a). These quintessentially Executive law enforcement powers—notably including the power to sue in federal court and seek penalties—well exceed the FTC's authority in 1935. Yet the district court overlooked this critical distinction, holding that *Humphrey's Executor* is controlling because, in its view, the "CFPB executes essentially the same responsibilities that the FTC did at the time of *Humphrey's Executor*." E.R. 15.

That reasoning presents an incomplete comparison between the FTC of 1935 and the modern CFPB. In particular, the FTC of 1935 could not bring civil enforcement proceedings that bear any similarity to CFPB enforcement proceedings. *Cf. CFPB v. Navient Corp.*, No. 3:17-

cv-00101-RDM, 2017 WL 3380530, at *15 (M.D. Pa. Aug. 4, 2017) ("Unlike the CFPB, . . . in 1935 the FTC could not bring a civil action in a district court for monetary penalties."). The FTC's enforcement power was sharply limited in 1935 to administrative proceedings followed by petitions for contempt with respect to any continuing violations of cease and desist orders. *See, e.g.*, *FTC v. Jantzen, Inc.*, 356 F.2d 253, 254 (9th Cir. 1966), *rev'd on other grounds*, 386 U.S. 228 (1967).

The CFPB likewise fails to acknowledge the differences between the FTC's limited enforcement powers in 1935 and the CFPB's broader powers today. In its briefing before this Court, the CFPB analogizes itself to the modern FTC and dismisses as "simply wrong" FIP's contention that the FTC's enforcement powers were much more limited in 1935 than they are today. CFPB's Opp'n Mot. Stay at 18–19, Dkt. No. 8. The CFPB relies entirely on the FTC's authority in 1935 to "apply to the circuit court of appeals . . . for the enforcement of its [cease and desist] order." 15 U.S.C. § 45 (1934). But the CFPB does not explain how the FTC's power to issue non-self-enforcing cease and desist orders that had "prospective application only and afford[ed] no specific consumer redress to consumers already injured" could be

considered just as broad as the powers the FTC—much less the CFPB—wields today. *Heater v. FTC*, 503 F.2d 321, 326 (9th Cir. 1974) (quoting S. Rep. No. 92-269, at 24 (1971)).

In addition, the FTC "did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently before that time that it lacked such power." *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973) (footnotes omitted). At the time of *Humphrey's Executor*, the Supreme Court understood that the "meaning and application" of the unfair competition prohibition would be determined not by the FTC but by "the courts" through the "'gradual process of judicial inclusion and exclusion.'" *FTC v. Raladam Co.*, 283 U.S. 643, 648 (1931) (quoting *Davidson v. City of New Orleans*, 96 U.S. 97, 104 (1877)). The CFPB's power to promulgate substantive rules and then unilaterally enforce those rules raises further separation-of-powers concerns because the "'accumulation of all powers, legislative, executive, and judiciary, in the same hands, . . . may justly be pronounced the very definition of tyranny." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 312 (2013) (Roberts, C.J., dissenting) (quoting The Federalist No. 47, at 324 (James Madison) (J. Cooke ed. 1961)).

The CFPB wields substantial Executive power by design. Congress intended for it to police compliance with the federal consumer financial laws by bringing enforcement actions and imposing or seeking "civil money penalties," among other forms of relief. 12 U.S.C. § 5565(a)(2)(H). This conclusion follows directly from the statutory text of the Consumer Financial Protection Act that created the CFPB. The agency's "purpose" is defined in § 5511(a): "The [CFPB] shall seek to *implement* and, where applicable, *enforce* Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a) (emphasis added). This directive makes the CFPB a prototypical Executive agency because the Constitution vests in the President the power and responsibility to implement and enforce federal law. *See CFPB v. Gordon*, 819 F.3d 1179, 1187 (9th Cir. 2016) ("As part of our separation of powers foundation, the Executive Branch is charged under our Constitution with the enforcement of federal law."); *see also Morrison*, 487 U.S. at 689 n.28 (agreeing with Justice White that the FTC's powers in 1935

would at present time be considered Executive "at least to some degree" because the FTC implemented an Act of Congress).

The fundamental flaw in the CFPB's position is illustrated by considering the implications of its arguments. If Congress could strip the President of his Article II power over the consumer financial protection laws by transferring that power to an independent agency, Congress could likewise impose for-cause removal restrictions on the heads of various agencies currently within the President's cabinet. Congress could, for example, limit the President's power over the Secretaries of Agriculture, Commerce, Education, Energy, Housing and Urban Development, Interior, Labor, Transportation, and Treasury— and potentially even the Attorney General and Secretaries of Defense and State. Eventually the United States would be left with a President who had only nominal responsibilities for policy and virtually no ability to ensure the faithful implementation and execution of federal law.

While Congress may not have attempted to cripple the presidency when creating the CFPB, the legislature took a step down that path by stripping the President of the Executive responsibility for enforcing federal consumer financial law. The district court wrongly concluded

that Congress could take away that Executive power, and its reasoning that the "CFPB's authority closely parallels the FTC's powers considered in *Humphrey's Executor*" creates an exception to Article II that swallows the rule. E.R. 15. If accepted by this Court, that reasoning would deprive the people of the "unity in the Federal Executive" that the Framers insisted upon to "ensure both vigor and accountability." *Printz v. United States*, 521 U.S. 898, 922 (1997).

### b. The Director is Not an Inferior Officer with Limited Tenure and Jurisdiction

The Supreme Court's decision in *Morrison* does not apply to the CFPB because the inferior officer in that case had "limited jurisdiction and tenure and lack[ed] policymaking or significant administrative authority." *Morrison*, 487 U.S. at 691. The Director, by contrast, serves a five-year term, 12 U.S.C. § 5491(c)(1), and "possesses enormous power over American business, American consumers, and the overall U.S. economy," *PHH Corp.*, 839 F.3d at 7. Indeed, the *PHH* Court described the Director as "the single most powerful official in the entire U.S. Government, other than the President." *Id.* at 17. As the United States explains in its brief to the en banc D.C. Circuit, the Supreme Court's holding in *Morrison* "obviously does not apply to any principal officer

who heads an executive agency, especially the CFPB Director."  Br. of United States, 2017 WL 1035617, at *14 n.3.

### c. The District Court Erred by Upholding the CFPB's Novel Structure

The district court erred by permitting Congress to usurp the President's constitutional duty to ensure faithful execution of the laws. While "Congress has endeavored to craft new institutions to tackle the challenges that modern society presents," E.R. 18, the Constitution does not permit Congress to vest substantial Executive power in a single person who is not accountable to the President.

The Framers understood all too well the abuses of power by the English sovereign, and they prioritized the separation of powers and established "structural protections against abuse of power." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  Congress is not free to erode those fundamental protections by "weighing . . . the advantages and drawbacks of each structure," E.R. 20, nor may a court justify such erosions based on the challenges of modern society.  To the contrary, the Supreme Court has consistently rejected efforts by Congress to violate the separation of powers in an effort to satisfy the policy goals of the day.  *See, e.g.*, *Metro. Washington Airports Auth. v. Citizens for*

*Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 277 (1991) ("[T]he statutory scheme challenged today provides a blueprint for extensive expansion of the legislative power beyond its constitutionally confined role."); *Bowsher*, 478 U.S. at 736 ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.'" (quoting *INS v. Chadha*, 462 U.S. 919, 944 (1983))).  As Justice Kennedy has noted, the "Constitution's structure requires a stability which transcends the convenience of the moment."  *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring).

The Constitution "establishes the President as the chief constitutional officer of the Executive Branch" and gives him the "unrestricted power . . . to remove the most important of his subordinates in their most important duties."  *Clinton v. Jones*, 520 U.S. 681, 699 n.29 (1997) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982)).  This removal power is necessary because the people do not elect the Director of the CFPB or any other officer of the United States.

The people look instead to the President to guide the "assistants or deputies . . . subject to his superintendence."  *Free Enter. Fund*, 561

U.S. at 498 (quoting The Federalist No. 72, at 487 (Alexander Hamilton) (J. Cooke ed. 1961)). "That is why the Framers sought to ensure that 'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Id.* (quoting 1 Annals of Cong. 499 ). Accordingly, the Framers gave the President "sufficient 'executive Power' to allow the President to remove subordinates who, in his or her view, are not faithfully implementing governing law." John F. Manning, *Separation of Powers As Ordinary Interpretation*, 124 Harv. L. Rev. 1939, 2036 (2011).

The CFPB's unprecedented structure authorizes the Director to execute a vast range of federal consumer financial laws based on his— not the President's—understanding of how those laws should be enforced. Congress designed the CFPB to vest Executive power over that wide range of laws in an independent agency that would not be subject to checks and balances by the President. That usurpation of Executive power violates Article II.

## B. The CFPB Cannot Enforce the CID Against FIP

The district court was wrong to conclude that the CFPB can exercise its Executive power by issuing a CID to FIP "even if the CFPB Director's for-cause removal protection violates separation-of-powers principles." E.R. 21. As this Court has recognized, an administrative subpoena such as the CID is "consistent with the Fourth Amendment" only if it is issued "'for a purpose Congress can order.'" *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1115 (9th Cir. 2012) (quoting *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946)). Congress cannot create a structurally unconstitutional law enforcement agency and then authorize that agency to seize the public's papers and effects.

To the contrary, the Constitution requires that the CFPB's investigative powers "be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.[5] The district court dismissed FIP's constitutional objections because the

---

[5] The CFPB's inability to enforce the CID does not depend on FIP showing that the CFPB's unconstitutional structure has affected its conduct. The "doctrine of separation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995).

CFPB has not sought to impose any penalty on FIP, but that reasoning is inconsistent with the Court's holding in *Free Enterprise Fund*. There, the Supreme Court concluded that the plaintiffs were entitled to relief against "the reporting requirements and auditing standards to which they are subject" because only a constitutional agency can enforce those duties. *Id*. The same is true here: the CFPB is structurally unconstitutional, and it is attempting to enforce its investigative powers against FIP without the safeguards the Constitution requires.

The district court also erred by analogizing the CFPB's law enforcement investigation power to that of a congressional subpoena. The trial court reasoned that the CFPB's investigation does not violate Article II because "Congress unquestionably has the authority to issue subpoenas." E.R. 21. That reasoning is not pertinent here because Congress is not "a law enforcement or trial agency," nor could Congress declare itself the nation's primary enforcer of consumer financial protection law. *Watkins v. United States*, 354 U.S. 178, 187 (1957).

Moreover, the district court's comparison of the CID to a congressional subpoena is inapt because the CFPB did not issue the CID "in aid of the legislative function." *Kilbourn v. Thompson*, 103 U.S.

168, 189 (1880). The express purpose of the CFPB's investigation is "to determine whether [CFPB] action to obtain legal or equitable relief would be in the public interest." E.R. 47. The CFPB is attempting to conduct that investigation here by using its "enforcement power" to "seek judicial relief," which is an "authority that cannot possibly be regarded as merely in aid of the legislative function of Congress." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam). This resort to judicial relief implicates the President's Article II power because a "lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting U.S. Const. art. II, § 3).

**C.   This Court Cannot Render the CID Enforceable by Modifying the CFPB's Structure**

The Court cannot cure the CFPB's constitutional defects because, to do so, this Court would have to rewrite the Consumer Financial Protection Act. While this Court has the power to sever the "problematic portions" of a statute "when confronting a constitutional flaw," *Free Enter. Fund*, 561 U.S. at 508 (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)), it must

ensure that the revised statute would "function in a manner consistent with the intent of Congress," particularly where the revision would "alter[] the balance of powers between the Legislative and Executive Branches of the Federal Government," *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis omitted). Congress's decision to include a severability clause "ease[s]" this inquiry,[6] but the Court must still decide which provisions of the Consumer Financial Protection Act to sever and then confirm that severing those provisions is consistent with congressional intent. *Id*. at 686.

To reform the CFPB into a constitutional agency, this Court would either (1) have to reduce the CFPB's Executive powers to the point where those powers no longer "interfere[] with the President's exercise of his constitutionally appointed functions," *Morrison*, 487 U.S. at 685; or (2) have to strike the for-cause removal restriction that prevents the President from supervising and controlling the Director's exercise of the

------

[6] The Dodd-Frank Wall Street Reform and Consumer Protection Act, within which the Consumer Financial Protection Act is found, includes the following severability clause: "If any provision of this Act, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this Act, the amendments made by this Act, and the application of the provisions of such to any person or circumstance shall not be affected thereby." 12 U.S.C. § 5302.

Article II power. Congress, not the courts, must choose between these alternatives because that choice turns on legislative intent and priorities. For example, Congress transferred to the CFPB various enforcement powers that were previously held by multi-member independent agencies such as the FTC. *See, e.g.*, 12 U.S.C. § 5581(b)(5)(B)(ii). It is both unclear from the record and beyond the province of the judiciary to decide whether Congress would have preferred to keep those enforcement powers within the FTC or to transfer those powers to an agency controlled by the President.

Even if this Court were to conclude that the cure for the CFPB's unconstitutional structure would be to strike the for-cause removal restriction, *accord PHH Corp.*, 839 F.3d at 39 (concluding that the proper remedy for the CFPB's unconstitutional structure is "severing the for-cause removal provision"), it would be inappropriate for this Court to implement that remedy because Congress—knowing that its proposed structure with a single Director removable only for cause was unconstitutional—likely would have elected instead to adopt an independent, multi-member commission within the meaning of *Humphrey's Executor*.

Senator Elizabeth Warren proposed the CFPB as a "traditional, multi-member independent agency." *Id.* at 6 (citing Elizabeth Warren, *Unsafe at Any Rate: If It's Good Enough for Microwaves, It's Good Enough for Mortgages. Why We Need a Financial Product Safety Commission*, Democracy, Summer 2007, at 8, 16–18). The "initial Executive Branch proposal in 2009 likewise envisioned a traditional, multi-member independent agency." *Id.* (citing Department of the Treasury, Financial Regulatory Reform: a New Foundation: Rebuilding Financial Supervision and Regulation 58 (2009)). And the "House-passed bill sponsored by Congressman Barney Frank and championed by Speaker Nancy Pelosi also contemplated a traditional, multi-member independent agency." *Id.* (citing H.R. 4173, 111th Cong. § 4103 (as passed by House, Dec. 11, 2009)). Striking the for-cause removal restriction would transform the CFPB into an agency fundamentally different from the one Congress created. Congress intended to give the CFPB's vast powers to an independent agency. *See, e.g.*, 156 Cong. Rec. H5239 (daily ed. June 30, 2010) (statement of Rep. Maloney) ("[The CFPB] will be completely independent, with an independently

appointed director, an independent budget, and an autonomous rulemaking authority.").

In any event, reforming the CFPB into an agency with a constitutional structure would not render the CFPB's CID to FIP enforceable because the CFPB issued that CID while its structure violated the Constitution. As the D.C. Circuit recognized in *PHH*, the Director exercises substantial discretion in deciding "how to enforce, when to enforce, and against whom to enforce the law." 839 F.3d at 7. At least where this discretion is exercised by a single person, the Constitution gives the President the power and the duty to supervise and control that person's exercise of the federal law enforcement power. But here, the Director alone decided to issue the CID to FIP, to deny FIP's objections to the CID, and to file a CID enforcement action against FIP, all without any check from the Executive.

The Director and, by extension, the CFPB had no constitutional authority to make those discretionary decisions. Accordingly, even if the CFPB were brought into compliance with Article II at some point in the future, the CFPB could not ratify its own past unconstitutional conduct because such conduct was prohibited at the time. *See Fed.*

*Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) ("[I]t is essential that the party ratifying should be able . . . to do the act ratified *at the time the act was done* . . . ." (emphasis added) (quoting *Cook v. Tullis*, 85 U.S. 332, 338 (1873))); *accord CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (holding that the Director could ratify the CFPB's enforcement actions initiated before the Senate confirmed him, in July 2013, "[b]ecause *the CFPB had the authority to bring the action at the time*" (emphasis added)). The CID that the CFPB issued, upheld, and sued to enforce while the CFPB remained structurally unconstitutional cannot be enforced now or in the future against FIP.

## CONCLUSION

"[I]llegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Stern v. Marshall*, 564 U.S. 462, 503 (2011) (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)). The Supreme Court's rulings in *Myers* and *Free Enterprise Fund* demonstrate that Congress deviated from Article II by vesting the President's Executive power in a structurally unconstitutional independent agency.

For the foregoing reasons, the Court should reverse the district court's order enforcing the CFPB's CID.

Dated: November 24, 2017

/s/ Christopher Wayne Jones
Christopher Wayne Jones
Direct: 919-755-8173
Samuel B. Hartzell
Direct: 919-755-2112
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601

Isabelle L. Ord
Direct: 415-836-2536
Julia Marie Brighton
Direct: 415-615-6091
DLA Piper LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105

*Counsel for Appellant*
*Future Income Payments, LLC*

## STATEMENT OF RELATED CASES

Future Income Payments, LLC, identifies the following related cases within the meaning of Ninth Circuit Rule 28-2.6. Each of these cases raises the same or closely related issues regarding the constitutionality of the Consumer Financial Protection Bureau.

(1)    *CFPB v. Seila Law, LLC*, No. 17-56324

(2)    *CFPB v. D&D Marketing, Inc.*, No. 17-55709

(3)    *CFPB v. Fomichev*, No. 17-55710

**CERTIFICATE OF COMPLIANCE**

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 12,593 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: November 24, 2017   /s/ Christopher Wayne Jones
             *Counsel for Appellant*
             *Future Income Payments, LLC*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 24th day of November, 2017, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Christopher Wayne Jones
*Counsel for Appellant*
*Future Income Payments, LLC*